UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
| | : | |
| v. | : | 10 Cr. 851 |
| | : | |
| STEPHEN DEPIRO, | : | 18 U.S.C. §§ 2, 371, 894(a), |
| a/k/a "Beach," | : | 1084(a), 1951(a), |
| ALBERT CERNADAS, | : | 1955(a), 1962(d) and 1963 |
| a/k/a "The Bull," | : | |
| NUNZIO LAGRASSO, | : | |
| RICHARD DEHMER, | : | |
| a/k/a "Dickie," | : | |
| EDWARD AULISI, | : | |
| a/k/a "Eddie," | : | |
| VINCENT AULISI, | : | |
| a/k/a "The Vet," | : | |
| THOMAS LEONARDIS, | : | |
| a/k/a "Tommy," | : | |
| ROBERT RUIZ, | : | |
| a/k/a "Bobby," | : | |
| MICHAEL TRUEBA, | : | |
| a/k/a "Mikey," | : | |
| RAMIRO QUINTANS, | : | |
| a/k/a "Romo," | : | |
| SALVATORE LAGRASSO, | : | |
| ANTHONY ALFANO, | : | |
| a/k/a "Brooklyn," | : | |
| TONINO COLANTONIO, | : | |
| a/k/a "Tony," | : | |
| JOHN HARTMANN, | : | |
| a/k/a "Lumpy," "Fatty" and | : | |
| "Fats," and | : | |
| GIUSEPPE PUGLIESE, | : | |
| a/k/a "Pepe" | : | |

**MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION PURSUANT
TO TITLE 18, UNITED STATES CODE, SECTION 3142**

PAUL J. FISHMAN
United States Attorney
District of New Jersey
970 Broad Street
Newark, New Jersey 07102

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion, pursuant to Title 18, United States Code, Section 3142, for an order detaining lead defendant Stephen Depiro pretrial and releasing the remaining defendants conditioned on the satisfaction of stringent conditions, enumerated below, including large secured bonds, house arrest, and prohibitions pertaining to employment and union activities.

Depiro is a soldier in the Genovese organized crime family of La Cosa Nostra ("the Genovese crime family") and, since at least 2005, has managed and controlled the crime family's waterfront rackets through corrupt International Longshoreman's Association ("ILA") union officials.  Pursuant to Title 18, United States Code, Section 3142(e), there is no condition or combination of conditions which "will reasonably assure the appearance of such person as required and the safety of any other person and the community."  Accordingly, the entry of an order detaining Depiro pretrial is warranted.

As alleged in the Superseding Indictment, the Genovese crime family has preyed for years upon ILA members employed in various positions on the New Jersey docks through a pattern of racketeering activity.  That pattern is predicated, in part, on the systematic use of actual and threatened force, violence and fear, to force dockworkers to make tribute payments - amounts

1

ranging up to thousands of dollars each year - to the Genovese crime family at Christmastime.  The extortions typically coincided with certain ILA members' receipt of "Container Royalty Fund" checks, a form of year-end compensation.  The breadth and scope of the extortion scheme at issue is stunning: It dates back nearly three decades; implicates the last three Presidents of ILA Local 1235 (defendants Albert Cernadas, Vincent Aulisi and Thomas Leonardis), a long-standing Vice-President of ILA Local 1235 (defendant Michael Trueba) and the long-standing Vice-President of ILA Local 1478 (defendant Nunzio LaGrasso); and illuminates the victimization of countless ILA members - including members of ILA Local 1, ILA Local 1235 and ILA Local 1478 - a number of whom are identified in the Superseding Indictment as John Does #1-11, by the Genovese crime family.[1]

---

[1]     An indictment was also unsealed today in the Eastern District of New York charging three ILA members – Patrick Cicalese, Robert Moreno and Manuel Salgado – with obstruction of justice and perjury.  Specifically, Patrick Cicalese, a Genovese crime family associate and the Chief Planning Clerk at Maher Terminals in Newark, New Jersey, is charged with attempting to obstruct justice and perjury in relation to his appearance before a grand jury in the Eastern District of New York in January 2010, during which appearance he testified falsely regarding a meeting he had arranged between himself and Stephen Depiro so that he (Cicalese) could "run things by" Depiro.  Moreno, an ILA Local 1478 Shop Steward, is charged with attempting to obstruct justice and perjury in relation to his federal grand jury appearance in Brooklyn, New York in November 2009, during which appearance he testified falsely that Nunzio LaGrasso had not previously asked Moreno to cover up for an ILA worker who was not at work.  Salgado, a Gang Boss at Port Newark Container Terminal ("PNCT"), is charged with attempting to obstruct justice and perjury in relation to his grand jury appearance in April 2010, during which

Depiro's criminal enterprise was not limited to criminal conduct on the port, and extended to illegal gambling operations, in which defendant Richard Dehmer threatened physical harm against individuals to collect outstanding debts.  For example, in a telephone conversation intercepted pursuant to court-authorized wiretapping, Dehmer discussed his plans for a victim (identified as John Doe #12 in the Superseding Indictment) who had failed to pay a gambling debt in a timely manner: "I guarantee you, he needs his hands to work.  He ain't working no more for a while."[2]

The fact that high-ranking union officials and others were willing to, and did, perpetrate such crimes, including crimes of violence, on Depiro's behalf constitutes compelling evidence that he poses a danger to the community; Depiro should be detained on that basis alone.  Moreover, Depiro previously has exhibited a complete disregard of the law by repeatedly violating prior conditions of pretrial release, supervised release and probation, demonstrating that he cannot be trusted to abide by the conditions of release and act in a lawful manner.

---

appearance Salgado testified falsely that he had never had a conversation with anyone about paying money around Christmastime on the ports.  Cicalese, Moreno and Salgado will be arraigned on the charges in the indictment this afternoon in Brooklyn, New York.

[2]     The government hereby provides the defendants with notice pursuant to Title 18, United States Code, Section 2518(9), of the government's intent to rely on evidence gathered pursuant to court-authorized wiretaps in the prosecution of this matter.

In addition, Depiro committed additional crimes while on release, and went so far as to conceal the flight from justice of fellow Genovese crime family member Michael Coppola, who was then the subject of a warrant related to a murder investigation. Depiro was convicted in the District of New Jersey of that conduct in 2002, but nonetheless, obviously undeterred, continued to aid Coppola, including facilitating Coppola's involvement in the Genovese crime family's control of the New Jersey piers. Depiro was indicted for that conduct on April 28, 2010, in the Eastern District of New York, which case is pending.

Finally, Depiro, now 55 years old, faces severe penalties if convicted of the instant charges; the prospect that he will spend his remaining days incarcerated provides compelling incentive to flee. Hence, the Court should enter an order detaining Depiro pending trial.

Second, the Court should condition the release of defendant Nunzio LaGrasso on the posting of a $1,000,000 bond, at least 70% secured. As Depiro's cousin and Vice-President of ILA Local 1478, LaGrasso served as one of the Genovese crime family's conduits at the ports, using his official union position to collect tribute payments from dockworkers each holiday season for more than 20 years, and funneling that cash to Depiro and the Genovese crime family. The charges against both LaGrasso and fellow Genovese crime family associate Albert Cernadas are

4

similar, as both served for extended periods as union officials and conduits for extortion payments to the Genovese crime family. In this regard, on December 13, 2010, defendant Albert Cernadas was arraigned on the charges contained in the first indictment in this case, at which time Magistrate Judge Esther Salas imposed bail in the amount of a $1,000,000 bond, secured by multiple properties with equity of approximately $700,000, *i.e.*, 70% fully secured. In short, since LaGrasso and Cernadas share relatively the same level of culpability in the extortion scheme at issue, their bail packages should be substantially similar.

Third, the Court should release defendant Richard Dehmer only conditioned on a secured bond and home detention. Dehmer served as a Genovese crime family associate who, along with Depiro and others, managed an illegal overseas sports betting operation and collected gambling debts. Despite his age, Dehmer was able to force individuals to pay debts by virtue of his criminal association: People paid Dehmer because they feared Depiro. In addition, Dehmer resorted to threats of violence against gambling debtors, stating in recorded telephone conversations that he intended to use a "bat" and "break every bone" to collect outstanding debts. Dehmer also operated an illegal gambling establishment in Kenilworth, New Jersey, which gamblers frequented for regular poker games. Finally, Dehmer faces up to 20 years in prison on each of the racketeering counts contained in the

5

Superseding Indictment.  Because Dehmer constitutes a danger to
the community and a flight risk given the severe penalties he is
facing, release on a secured bond with a requirement of home
detention is appropriate.

Fourth, pretrial release conditions comprising
significant, secured bonds are necessary and appropriate with
respect to defendants Edward Aulisi, Vincent Aulisi, Thomas
Leonardis, Robert Ruiz, Michael Trueba, Ramiro Quintans and
Salvatore LaGrasso.  These defendants, nearly all of whom were
union or port supervisors, abused their ILA positions to extort
port workers entrusted to their stewardship.  These defendants
extracted tribute payments from their co-workers at Christmastime
each year, and did so through the threat of physical violence and
the infliction of psychological harm.  Simply put, these
defendants preyed upon their co-workers' vulnerability and fear
for their physical safety and job security.  That these defendants
went so far as to shake-down the same individuals they worked
alongside of each day speaks volumes regarding their criminal
proclivities and the danger to the community and potential
witnesses posed by pretrial release.  Moreover, the defendants
pose flight risks because they will be removed from their jobs and
face severe penalties if convicted.

## OVERVIEW OF DEFENDANTS & CHARGES[3]

A.    RICO DEFENDANTS

   1.   RICO Charges (Counts 1 and 2)

   Defendants Stephen Depiro, Albert Cernadas, Nunzio LaGrasso and Richard Dehmer (collectively, the "RICO Defendants") are charged with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., as members and associates of the Genovese crime family. As alleged in the Superseding Indictment, the Genovese crime family's primary purpose is to generate money for its members and associates through various criminal activities, including extortion, loansharking and gambling; among the methods and means by which the Genovese crime family furthers those criminal goals are the use and threatened use of violence and threats of economic harm.

   Indeed, the charges against Depiro, Cernadas and Nunzio LaGrasso arise from a multi-decade conspiracy to extort ILA union workers on the New Jersey waterfront by threat of force, violence and fear. Similarly, Depiro and Dehmer are charged with a racketeering conspiracy predicated on the extortionate collection of unlawful debt ("CUD RICO"), which conduct involved prospective force and violence. The maximum penalty on both RICO Counts 1 and 2 is a 20-year period of incarceration.

---

   [3]    The charges and racketeering acts contained in the Superseding Indictment are summarized at "Appendix A" hereto.

### 2. Substantive Extortion Charges (Counts 3-4; 9; 14-25; 43-44)

RICO Defendants Depiro, Cernadas and Nunzio LaGrasso are also charged with conspiring to commit Hobbs Act extortion and numerous substantive extortion counts. RICO Defendants Depiro and Dehmer are charged with conspiring to make extortionate collections of credit and Dehmer is charged with a substantive violation regarding same. Each substantive extortion violation carries a maximum penalty of 20 years' incarceration.

### 3. Substantive Illegal Gambling Charges (Counts 41-42; 45-53)

RICO Defendants Depiro and Dehmer are also charged with illegal gambling offenses relating to bookmaking and conspiracy to commit same, which carry a maximum penalty of five years' incarceration. Additionally, Dehmer is charged with offenses relating to an illegal gambling club, which carry a maximum penalty of five years' incarceration, and the transmission of wagering information, for which the maximum penalty is 2 years' incarceration.[4]

---

[4] Defendant John Hartmann is charged with conspiring to commit, and the commission of, bookmaking. Similarly, defendants Giuseppe Pugliese, Anthony Alfano and Tonino Colantonio are charged in relation to their participation in illegal poker games. These defendants, Hartmann, Pugliese, Alfano and Colantonio (collectively, the "Gambling Defendants"), are not charged with crimes of violence and will not be addressed separately herein.

B.        **EXTORTION DEFENDANTS**

Defendants Albert Cernadas, Nunzio LaGrasso, Edward Aulisi, Vincent Aulisi, Thomas Leonardis, Robert Ruiz, Michael Trueba, Ramiro Quintans and Salvatore LaGrasso are separately charged with conspiring to commit Hobbs Act extortion and numerous substantive extortion violations (collectively, the "Extortion Defendants"). Each of violation charged carries a maximum penalty of 20 years' incarceration. As summarized below, these defendants used their lucrative positions in the ILA to perpetuate a long-term extortion scheme of ILA dockworkers on the New Jersey piers:

| Defendant | Position(s) | Compensation (Year) |
|-----------|-------------|---------------------|
| CERNADAS | ILA Local 1235 President; ILA Executive Vice-President | $532,719 (2004) |
| N. LAGRASSO | ILA Local 1478 Vice-President; ILA Representative | $255,916 (2010) |
| E. AULISI | ILA Local 1 Checker | $99,090 (2007) |
| V. AULISI | ILA Local 1235 President | $181,432 (2007) |
| LEONARDIS | ILA Local 1235 President; ILA Representative | $256,063 (2010) |
| RUIZ | ILA Local 1235 Delegate; ILA Representative | $230,512 (2010) |
| TRUEBA | ILA Local 1235 Vice-President; Maher Terminals Shop Steward | $403,756 (2010) |
| QUINTANS | ILA Local 1235 Stevedore Foreman | $269,035 (2010) |
| S. LAGRASSO | ILA Local 1235 Head General Foreman | $274,790 (2010) |

## BACKGROUND

The Superseding Indictment unsealed today is the latest in a succession of cases targeting the Genovese crime family's control over the New Jersey waterfront through corrupt ILA union officials.  Stephen Depiro, a "made" member in the Genovese crime family, is the most recent successor from the violent crew that has controlled the crime family's port-related rackets for decades.

### A.        ILA Union Corruption

On February 11, 2005, a superseding indictment was filed in the Eastern District of New York against four defendants, Arthur Coffey, Harold Daggett, Albert Cernadas and Lawrence Ricci. Among other positions they held in the ILA, Coffey was the President of ILA Locals 1922, 1922-1 and 2062, Daggett was the President of ILA Local 1804-1, and Cernadas was the President of ILA Local 1235.  The indictment alleged that Coffey and Daggett were associates of Genovese crime family crews based in New York, Ricci was a captain in a crew based in Northern New Jersey – reportedly under Tino Fiumara – and that Cernadas was a Genovese crime family associate connected to Ricci's crew.

Count Two of the indictment charged the defendants with a wire/mail fraud conspiracy between 1996 and October 2004 relating to various union benefit funds which provided health care benefits to members of the ILA in different regions of the United

States.  As part of the conspiracy, it was alleged that Coffey, Daggett and Cernadas secretly agreed to award contracts relating to the provision of fund benefits to two different companies, one of which paid an associate of organized crime and the other of which was associated with organized crime.  By awarding contracts to these companies, Coffey, Daggett and Cernadas allegedly intended to earn money for organized crime and ensure the assistance of organized crime in maintaining their positions and salaries as officers of the ILA.

On September 12, 2005, Cernadas pled guilty to Count Two of the indictment and received a sentence of probation.  In addition, Cernadas entered into a consent decree which, among other things, barred him from further employment with the ILA.  On September 19, 2005, the remaining defendants proceeded to trial, which resulted in their acquittal.  While the trial was underway, however, defendant Ricci failed to attend court and could not be located.  Weeks later, on or about November 30, 2005, Ricci's body was found in the trunk of a car behind the Huck Finn Diner in Union, New Jersey.  The investigation into Ricci's murder is ongoing, and court documents have been filed in the Eastern District of New York concerning suspected targets Tino Fiumara and Michael Coppola, among others.

B.       RICO Prosecution of Michael Coppola

Michael Coppola, a Genovese captain, was a fugitive from
a New Jersey state murder beginning in 1996, when he was served
with a summons to provide DNA, until March 2007, when he was
captured on the Upper West Side of Manhattan.  On July 21, 2009,
in the Eastern District of New York, Coppola was convicted after
trial of racketeering and racketeering conspiracy, including a
predicate act involving extortion and wire fraud in regard to ILA
Local 1235.

At Coppola's trial, witnesses testified regarding the
existence of a long-standing agreement between the Gambino and
Genovese crime families to divide control over the New York/New
Jersey waterfront, pursuant to which the ports in Brooklyn and
Staten Island are controlled by the Gambino crime family, and the
Manhattan and New Jersey ports are controlled by the Genovese
crime family.  Witness testimony and other evidence further
established that the Genovese crime family crew that has
controlled the New Jersey waterfront consisted of, among others,
Tino Fiumara, Michael Coppola, Albert Cernadas, Vincent Aulisi and
Edward Aulisi.

For example, on March 6, 2007, Coppola had a telephone
conversation with defendant Edward Aulisi, a Genovese crime family
associate, that directly pertained to the crime family's three-
decade conspiracy to control the leadership of ILA Local 1235.  At

the time, Edward Aulisi's father, Vincent Aulisi, also a Genovese crime family associate, was the President of Local 1235, after Cernadas had pled guilty and agreed to a life-time bar from participating in the ILA.  During the conversation, Coppola and Aulisi discussed several topics, including payments from Local 1235 to the mafia, as well as Coppola's crew's historical control over the union.  A pertinent excerpt of the conversation follows:

| | |
|---|---|
| Aulisi: | On that note.  Ohh, and the VET told me to pass it on.  Umm.  What the hell did he say to me?  Ohh, that, ah, he was glad that, ah, the other, the Cuban, that RICKY RICARDO, was there when this guy made mention hey, once I'm outta, once I'm gone from here this thing stops.  So, MIKE, the VET said, this thing stops? The beat goes on, whether you're here or not.  But, RICKY RICARDO was there when he said, he said it. |
| Coppola: | Who, who. |
| Aulisi: | He said I, want you to relay that. |
| Coppola: | Which guy?  Who said that? |
| Aulisi: | The BULL.  You know when this is gone, when I'm gone, he says this thing is gonna end.  Meaning, meaning ahh, the month, you know, the the christmases, and everything else, he says what you talking about? |
| Coppola: | Yeah, yeah. |
| Aulisi: | This gonna, thing's gonna go on.  He wanted me to mention this thing almost, almost doubled. |
| Coppola: | (UI) |
| Aulisi: | (UI) |

13

Coppola:      Yeah we we –

Aulisi:       (UI)

Coppola:      We don't want him, we don't want him to
              be aware of that.  We don't want him to
              be aware of anything.

Aulisi:       No, no, he doesn't go into them lines
              with him, but he just want, he wanted me
              to make mention, you know.  I'm glad that
              the RICKY was there to hear, cause after
              the guy left he said RICKY came up to me,
              and says you mention that that this guy
              wants this thing, this ain't gonna go no
              more, he's got that idea so.

Coppola:      Well, you heard the thing, you heard the
              thing, what he asked for with his kid
              didn't you?

Aulisi:       Yeah, yeah, I was laughing (UI)

Coppola:      (UI) fucking (UI)

Aulisi:       He's nuts.

Coppola:      Are they freaking insane?  First of all –
              –

Aulisi:       (UI)

Coppola:      He was the first one, he was the first
              one, when, when the CONG (ph.) you know
              who that is?

Aulisi:       Ahh, um I think so.

Coppola:      Just the, with the same name as ahh as
              ahhh POP, the guy that was there before.

Aulisi:       Right.

Coppola:      In the beginning.

Aulisi:       Yeah, yeah.

14

Coppola:     OK, ok, alright when he left he wanted to
             leave his wife there.  We said under no
             circumstances, he, he --

Aulisi:      Right.

Coppola:     You know, and, and, we were right next to
             him all the time during this whole thing,
             and he said under no circumstances.  I
             said, we, you know, I said, the other guy
             said, we had to learn from the past.

Aulisi:      Right right.

Coppola:     You see the guys that where over with,
             the ahh, with the truck drivers, when he
             put his –

Aulisi:      Yes, yes.

Coppola:     Daughter there.  When he put his daughter
             there that time.  It created nothing but
             problems with the men, because the men
             resent it.  Because, in other words, what
             about the guys that work all their lives
             through the rank and file, and, and
             they're coming up the hard way.  Don't
             they get a shot?  So, you think somebody
             --

Aulisi:      It should be a natural common sense
             thing, that's right.

Coppola:     And, and, you get, you know, you get a
             kid out of left field.  Where's the
             respect gonna come from and where's
             everything else gonna come from?  So, I
             sent --

Aulisi:      It ain't.

Coppola:     word back, under no circumstance, under
             no, what you call and what does he have,
             ahh, a short memory?  He was the first
             one to bitch about when the CONG wanted
             to do it, and then I said, well, we know,
             and, tell him to remember what happened
             to these guys when he wanted to put his

                          15

|            | daughter there.  You know, you have everybody else there.  They're all making a living, Everybody -- |
|------------|------------------------------------------|
| Aulisi:    | Right. |
| Coppola:   | It's time, it's time for everybody to move on and turn the page. |
| Aulisi:    | Right. |
| Coppola:   | We don't want no part of that kid. |
| Aulisi:    | I hear ya.  Well, you know, its funny and ironic when when he had said you know, this guy made mention to me -- [operator: thirty seconds] - that the kid wasn't gonna, the kid wasn't gonna listen to anybody, anyway, now all of sudden he can talk to him, you know, so -- |
| Coppola:   | Yeah, well he can't talk to him. |
| Aulisi:    | Yeah. |
| Coppola:   | He can't talk.  It's, it's, not gonna happen to, you relay that to, to, POP that's all. |
| Aulisi:    | Ok. |

In this conversation, Aulisi told Coppola that Cernadas, a/k/a "The Bull," had discussed with the then-current President of Local 1235, Vincent Aulisi, whether "the month" and "the christmases" (payments) were going to end when Cernadas left the union.  In the recording, Edward Aulisi told Coppola that Vincent Aulisi had instructed Edward (the speaker) to tell Coppola that the "month" and "christmases" were going to continue and in fact had "almost doubled."  Coppola responded by telling Edward that they do not want Cernadas "to be aware of anything."

16

Coppola and Edward Aulisi also discussed the fact that Cernadas had asked for something for his "kid," but that Coppola had "sent word back" denying Cernadas's request.  During this portion of the conversation, Coppola related to Aulisi the story of what happened when the former president of Local 1235 wanted to leave his wife in place at the union after leaving himself. Coppola refers to the former president as "Cong" and "[the guy] with the same name as ahh as ahhh POP, the guy that was there before."  The former president of ILA Local 1235 was Vincent Colucci, who shares a first name with Vincent Aulisi (Edward Aulisi's "Pop"), and was nicknamed "Cong."[5]

With Coppola's co-conspirator statements evidencing that his relationship with the union dates to the time that Vincent Colucci was president, including the time period in which Cernadas was president, and acknowledging the continued flow of payments made by the union membership to the Genovese crime family at Christmastime, Coppola clearly admitted his crew's – and Cernadas's – involvement in a long-term conspiracy to extort the members of Local 1235 of money.  With the statement, "we were

---

[5]   Former New Jersey state detective Robert Delaney served in an undercover capacity in an investigation into Fiumara and Coppola in the 1970s.  He testified during the Coppola trial in 2009 that "Cong" or "Viet Cong" was a nickname for Vincent Colucci and that Fiumara and Coppola often used nicknames that reflected the real initials of the person being described.  He also testified, in substance, that Lawrence Ricci was closely associated with Fiumara and Coppola and that he participated in the Genovese crime family's control of the New Jersey waterfront.

right next to him all the time during this whole thing," Coppola explained to co-conspirator Edward Aulisi that Coppola and his crew were involved in directing Cernadas for the duration of Cernadas's control of the union, including directing Cernadas to extort union members at Christmastime. Notably, Cernadas became President of Local 1235 in the early 1980s, after Colucci was convicted of racketeering. In the conversation, Coppola also described "Cong" as the individual who was "there" (at the union) "in the beginning." Official records from the Department of Labor show that Colucci was President of Local 1235 during the 1970s, from at least 1974.

In short, at trial in 2009, the evidence showed, among other things, that Coppola had participated in a wire fraud and extortion scheme involving the Genovese crime family's control of a succession of Presidents of ILA Local 1235 – including RICO Defendant Albert Cernadas and Extortion Defendant Vincent Aulisi.[6]

---

[6] In convicting Coppola of racketeering conspiracy and racketeering, the jury concluded that Coppola's involvement in the 1977 murder of fellow Genovese crime family member, Giovanni Larducci, also known as "John Lardiere," "Coca Cola" and "Johnny Cokes," was not proved. At trial, however, the government offered testimony to establish that Coppola had admitted to a cooperating witness that he had been the individual who shot Lardiere. Specifically, Coppola told others, "some you do with tears in your eyes," and went on to describe how he shot Lardiere but that his gun jammed. Lardiere then stated, "What're you gonna do now, tough guy?" Coppola described how he then drew a second pistol from his ankle holster. Coppola then shot Lardiere in the stomach, and "finished him off" by standing over Lardiere and shooting him again. Coppola further related that "[Lardiere] was a tough guy, he died like a man." Crime scene

Following his conviction, Coppola was sentenced on December 18, 2009, to a term of incarceration of 16 years.

C.        The Instant Prosecution

          Prosecution witnesses are expected to testify that Depiro, first as a member of the Genovese crime family crew that controlled the New Jersey ports and then, after Ricci's death, as the Genovese crime family member responsible for overseeing the crime family's rackets at the ports on behalf of Fiumara and Coppola (who was a fugitive at the time), exercised influence over ILA officials.  The evidence is expected to show that Depiro rose to such prominence, in part, due to Michael Coppola's absence.  As part of his control over union officials, Depiro conspired to extort members of the ILA and received proceeds from that extortion racket.  Indeed, as discussed further below, in September 1998 Depiro was captured pursuant to a court-authorized wiretap discussing with Fiumara the extortion scheme at issue, with Depiro claiming that he was going to double the amount of the tribute payments due from extortion victims.

_____

evidence and the testimony of a medical examiner strongly corroborated Coppola's admissions as to how the murder was committed.

## LEGAL STANDARD

Pursuant to the Bail Reform Act ("the Act"), a defendant's pretrial detention is warranted "upon proof of a likelihood of flight, a threatened obstruction of justice or a danger of recidivism in one or more the crimes" specified in the statute. <u>United States v. Himler</u>, 797 F.2d 156, 160 (3d Cir. 1986); 18 U.S.C. § 3142(e).  The Third Circuit has held that the Act was designed to address "the growing problem of crimes committed by persons on release and the recognition that 'there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons.'" <u>United States v. Accetturo</u>, 783 F.2d 382, 383-84 (3d Cir. 1986).

The Act enumerates four factors for consideration: (1) the nature and circumstances of the crime charged, including whether the offense is a "crime of violence;" (2) the nature and seriousness of the danger posed by the defendant's release; (3) the history and characteristics of the defendant; and (4) the weight of the evidence against the defendant.  <u>See</u> <u>id.</u> § 3142(g). Given the generalized nature of these factors, however, it is necessary to consult case law for the particularized, context-specific analysis applicable here.

20

## A.        The Crimes Charged Are Crimes of Violence

"The Act operates only on individuals who have been arrested for a specific category of extremely serious offenses. Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest." United States v. Salerno, 481 U.S. 739, 750 (1987). As the U.S. Supreme Court held in Salerno, "crimes of violence" fall within that narrow category of extremely serious offenses for which detention is warranted.

Title 18, United States Code, Section 3156(a)(4) defines the term "crime of violence" as "(A) an offense that has [as] an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another; (B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

It is well established that extortion is a crime of violence.  Indeed, the Superseding Indictment specifically alleges that the extortion of ILA dockworkers was carried out through "actual and threatened force, violence and fear." See also United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) ("Certainly, it cannot be gainsaid that extortion is a 'crime of violence' as that term is defined by the [Bail Reform Act]."); United States v.

21

Santora, No. 07-1103, 2007 WL 1533839, at *2 (2d Cir. May 25, 2007) (finding that defendant "had committed a crime of violence, specifically conspiracy to commit extortion"); United States v. Defede, 7 F. Supp. 2d 390, 396 (S.D.N.Y. 1998) ("The offense, extortion, is a crime of violence both because it is so defined by statute and because its completion often involves the threat of physical harm.").

        Similarly, conspiring to use and the use of extortionate means to collect and attempt to collect extensions of credit in violation of 18 U.S.C. § 894(a)(1) are "crimes of violence."  The Superseding Indictment alleges that defendants Depiro and Dehmer engaged in this conduct with respect to an identified victim, who was threatened with serious bodily harm.  See also United States v. Quintina, 845 F. Supp. 38, 39 (D. Mass. 1994) (holding conspiracy to use extortionate means to collect extension of credit and the use of extortionate means to collect and attempt to collect extensions of credit "meet the statutory definitions of 'crimes of violence'").

B.        **Considerations Specific to Organized Crime Defendants**

An additional factor that militates against release in cases involving crimes of violence is whether the defendant is associated with a criminal organization, the activities of which routinely include violence and threats of violence.  Specifically, with respect to an individual's association with organized crime, in United States v. Leonetti, Cr. No. 88-00003, 1988 WL 61738 (E.D. Pa. June 9, 1988), Judge Antwerpen held:

> The individual criminal acts allegedly committed by each defendant will be examined, but these individual acts must always be viewed in the context of each defendant's alleged membership in *La Cosa Nostra* and what that membership and organization represents.

> A willingness to kill people who testify against them and to enforce *Omerta*, the code of silence, through murder, are rules that each defendant adopts and agrees to adhere to through his membership in *La Cosa Nostra*. By these rules, each of the six defendants seeking bail presents a very real danger to potential witnesses in this case.

Id. at *3 (emphasis in original); accord United States v. Martorano, Cr. No. 92-26-J, 1992 WL 73558, at *7 (D. Mass. Mar. 23, 1992) (holding that "it is appropriate to consider the nature of the La Cosa Nostra organizations in making the detention calculation.  In particular, courts have noted the oath taken by members of these organizations . . . of vowing to kill any individual posing a threat to the organization.  The testimony before the Court indicates that membership in these organizations

is highly probative of both danger and flight.  Past cases also demonstrate a danger of obstruction of justice.").

Consequently, where, as here, there has been a probable cause finding that a member or associate of organized crime committed crimes of violence, courts routinely find that the risk of continued criminal conduct is substantial and detention is appropriate.  The rationale for detention in such cases is clear:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions.  The illegal businesses, in place for many years, require constant attention and protection, or they will fail.  Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

For example, in Ciccone, 312 F.3d at 537-38, the Second Circuit affirmed the pre-trial detention of Gambino family boss Peter Gotti, where he was alleged to have "directed the activities of his codefendants," who committed various exortions, including extortions of the ILA.  The Second Circuit ordered Gotti detained irrespective of the fact that he "was not charged with having committed the extortions alleged in the indictment."

24

Id.; accord Defede, 7 F. Supp. 2d at 391, 395 (ordering detention of defendant charged with extortion and extortion conspiracy, and holding that "[g]iven Defede's position of leadership in a notorious and violent criminal organization, his ability to plan, order and supervise criminal activity is of paramount importance. Defede is a danger at least as much for what he might direct or assist others in doing as for what he might do himself").

Similarly, in United States v. Colombo, 777 F.2d 96 (2d Cir. 1985), the captain of an organized crime family crew was ordered detained because the operation of that organization posed a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations."  The Second Circuit affirmed the result despite a finding by the lower court that there was "virtually no evidence of Colombo's direct participation in the crimes charged."  Id. at 99.  Finally, the Third Circuit in United States v. Provenzano, 605 F.2d 85, 89 (3d Cir. 1979), affirmed the district court's order of detention pending appeal where defendant had convictions for extortion and labor racketeering, raising the potential that defendant "would continue to exercise his influence within the union corruptly and in violation of criminal law."

C.          Obstruction of Justice

            Pretrial detention also is warranted in cases in which

there exists "a serious risk that such person will obstruct or

attempt to obstruct justice." 18 U.S.C. § 3142(f)(2)(B).

Although the underlying rationale for the rule is based to some

degree on the need to protect potential witnesses from harm,

detention is nonetheless authorized by statute absent the

prospect of violence.  See, e.g., United States v. LaFontaine,

210 F.3d 125, 135 (2d Cir. 2000) (affirming lower court's

revocation of defendant's bail based on evidence that LaFontaine

had sought to influence witnesses while released on bond, and

reiterating "that a record of violence or dangerousness [in the

sense of violence or threats aimed against witnesses] is not

necessary to support pre-trial detention").

            Moreover, the statute is not limited to witness

tampering, and instead sweeps broadly to protect any perversion

of the justice process.  As the Second Circuit observed in

LaFontaine, "pre-trial detention was even more justified in cases

of violations related to the trial process (such as witness

tampering) than in cases where the defendant's past criminality

was said to support a finding of general dangerousness."  Id. at

134.  Thus, conduct involving the harboring of a fugitive, for

example, constitutes obstruction of justice within the reach of

the statute.  See, e.g., United States v. Beckstead, Cr. No. 04-

                              26

5103, 2006 WL 1112853 (4th Cir. Apr. 26, 2006) (holding that
conviction for harboring fugitive warranted upward sentencing
adjustment for obstruction of justice).

D.      **Elaborate Bail Packages**

        It is well established that even the most elaborate
conditions of home detention cannot substitute for incarceration
where the defendant is violent or cannot be trusted to comply
with the conditions of release.  For example, in <u>United States v.
Bergrin</u>, Cr. No. 09-369, 2009 WL 1560039, at *9 (D.N.J. May 29,
2009), Magistrate Judge Madeline Cox Arleo ordered the defendant
detained where he had advanced his criminal enterprise "through
conversations and meetings" in which he directed others to commit
crimes because "even the most stringent house arrest does not
address this harm and does not minimize the very real possibility
that further similar criminal conduct could be carried out from
home."

        Courts have consistently held, particularly with
respect to prohibiting criminal association, that elaborate bail
conditions

        have an Achilles' heel: if there is a unifying theme in
        this intricate set of restrictions, it is that
        virtually all of them hinge on the defendant's good
        faith compliance.  To illustrate, electronic
        monitoring, while valuable in pretrial release cases
        . . . cannot be expected to prevent a defendant from
        committing crimes or deter him from participating in
        felonious activity within the monitoring radius.
        Second, by allowing outside visits to doctors and
        lawyers, the conditions open up a sizeable loophole;

27

> there is no feasible way of assuring that [the
> defendant], while en route to and from such
> appointments, will not make stops and take detours with
> a view toward continuing his criminal life.  House
> arrest poses much the same problem; limiting visitors
> can only work, for example, if the appellee submits the
> names of potential guests for clearance. . . which,
> itself, is honor-dependent.

United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir. 1990);

see also United States v. Bellomo, 944 F. Supp. 1160, 1167

(S.D.N.Y. 1996) ("As in *Colombo* and *Orena*, the nature and extent

of the danger that Bellomo presents arises not only from the

threat of violent acts on his part, but from his position of

leadership in a criminal organization and his ability to plan,

order, and supervise criminal activity arising from that position

as well.  He is a danger at least as much for what he might

direct or assist others in doing as for what he might do himself.

Keeping him under house arrest would not defuse this danger.");

United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("home

detention and electronic monitoring at best 'elaborately

replicate a detention facility without the confidence of security

such a facility instills'").

**ARGUMENT**

A.     **RICO DEFENDANTS**

1.    **Genovese Crime Family Soldier Stephen Depiro**

a.  **Depiro's Lengthy Criminal Record**

As a threshold matter, Depiro is a repeat felon with
several convictions dating back 20 years.  Specifically, on or
about May 11, 1990, Depiro pled guilty to possession of gambling
Records in the Second Degree (Bookmaking) in Richmond County, New
York criminal court, and received a conditional discharge.  On
June 9, 1993, Depiro was again charged with promoting gambling,
conspiracy and possession of gambling records, in New Jersey
Superior Court, Somerset County, and received pretrial
intervention, pursuant to which the charges subsequently were
dismissed.

On or about April 14, 1998, Depiro was charged with
violations of the federal RICO laws, pursuant to which then-
Magistrate Judge Stanley R. Chesler set bail for Depiro in the
amount of a $250,000 bond with standard bail conditions.  During
the relevant time period, Depiro worked as a longshoreman at
Maher Terminal in Port Newark, where he allegedly oversaw
loansharking and gambling rackets under Joseph Queli, another
member of the Genovese crime family.  On or about April 16, 1999,
Depiro pled guilty to racketeering, in violation of 18 U.S.C. §
1962©, for which he was sentenced to 30 months of incarceration

29

and three years' supervised release, which terminated on July 17, 2004.

On April 26, 2002, Depiro was charged with conspiring with Tino Fiumara regarding then-fugitive Michael Coppola.  On March 21, 2003, Depiro pled guilty to misprision of a felony for concealing Coppola's unlawful flight to avoid prosecution between August 1996 and April 1999.  The Superseding Information to which Depiro pled guilty charged that he "was an associate of . . . the Genovese Crime Family."  Depiro subsequently was sentenced to probation and a four-year term of supervised release, which ended on November 24, 2007.

On April 28, 2010, Depiro was indicted by a federal grand jury in the Eastern District of New York on charges related to Depiro's harboring and otherwise assisting fugitive Michael Coppola between May 2004 and March 2007.  See United States v. Stephen Depiro, 10 Cr. 341 (ILG) (E.D.N.Y.).  These charges against Depiro are still pending.

Depiro's past criminal record and persistent recidivism is indicative of an inability or unwillingness to comply with the rule of law.  In either event, Depiro's release poses a danger to the community and his detention is warranted on this ground alone.  See, e.g., Provenzano, 605 F.2d at 95 ("The trial judge's study of decisions interpreting the Act's 'danger to the community' provision, however, convinces him that courts are not

30

confined in such cases to considering only harms involving an
aura of violence.  We agree and hold that a defendant's
propensity to commit crime generally, even if the resulting harm
would be not solely physical, may constitute a sufficient risk of
danger to come within the contemplation of the Act.").

### b. Depiro's Repeated Violations of Pretrial Release, Supervised Release and Probation

An analysis of Depiro's criminal history illustrates
that Depiro has been undeterred from the commission of additional
crimes by previously imposed conditions of release.  There is,
therefore, no reason to believe that Depiro will comply with even
the most stringent conditions of release imposed by this Court.
In summary, as a result of his 1998 racketeering arrest and
conviction, Depiro was on pretrial release from April 1998
through April 1999, and, following his 30-month incarceration, on
supervised release through July 2004.  Nonetheless, Depiro
admittedly violated the conditions of pretrial release set by
Magistrate Judge Chesler, and in 2003 pled guilty to a felony
involving conduct between August 1996 and April 1999, relating to
Coppola's flight.  Depiro's 2003 conviction resulted in probation
and a four-year term of supervised release through November 2007.
Subsequently, a grand jury indicted Depiro for again assisting
Coppola's flight between May 2004 and March 2007, in violation of
the foregoing conditions.  Moreover, in January 2006, Depiro
again admittedly violated parole and supervised release by

31

associating with a known, violent felon.  Finally, as set forth further below, a grand jury has found probable cause that Depiro yet again violated the foregoing conditions of release by engaging in the conduct at issue here.

Specifically, beginning in April 1998, Depiro was on pretrial release on conditions set by Magistrate Judge Chesler relating to his arrest for racketeering.  It cannot be gainsaid that those pretrial release conditions clearly were inadequate to protect the community, as Depiro admitted that he continued to violate criminal law with respect to concealing the flight from justice of Coppola from August 1996 through April 1999.  Indeed, the final Pre-Sentence Report prepared in that case documented numerous intercepted telephone conversations between Depiro and Fiumara relating to the offense conduct in September 1998.[7] Depiro's admitted violations of pretrial release in this regard end the inquiry as to whether he should be released here - he should not.

Similarly, Depiro was on probation and supervised release from his March 2003 felony conviction relating to the foregoing conduct when he once again violated the conditions imposed by Judge John W. Bissell.  Specifically, on or about

---

[7]   The Government has not filed the October 2003 Pre-Sentence Report electronically, but will make the Report available for inspection by the Court and Depiro at the detention hearing.

32

January 3, 2006, Depiro admitted to a violation for associating with Daniel Dellisanti, another "made" member of the Genovese crime family.

Depiro's violations of Judge Bissell's judgment, however, did not end there: an Eastern District of New York grand jury recently indicted Depiro, finding probable cause to believe that he violated federal law by harboring and otherwise aiding Coppola between May 2004 and March 2007.  Indeed, the evidence in that case includes, among other things, an intercepted telephone call between Depiro and Coppola in March 2007, well before the supervision imposed by Judge Bissell terminated in November 2007.

Finally, with respect to the instant charges, a federal grand jury in Newark, New Jersey has found probable cause to believe that Depiro conspired to violate the federal RICO laws from at least December 1982 through January 2011.  Moreover, the evidence at trial will include the September 14, 1998 recorded telephone call between Depiro and Fiumara discussed below, in which Depiro stated that he intended to double the amount extorted from ILA members.  Of course, Depiro's conversation with Fiumara in this regard occurred <u>while he was on pretrial release pursuant to conditions imposed by Magistrate Judge Chesler only five months earlier, in April 1998.</u>

33

In short, there can be no real question that any
conditions of pretrial release set by this Court would be flouted
by Depiro, just as he previously did with respect to Magistrate
Judge Chesler's and Judge Bissell's conditions through persistent
violations of pretrial release, supervised release and probation.
See, e.g., Bergrin, 2009 WL 1560039, at *9, *11 ("Plainly, he did
not abide by his conditions of release.  The court has no
assurance that he will refrain from criminal conduct if released.
.  .  .   The serious nature of the charges, allegedly committed
while defendant was on bail, militates strongly in favor of
detention."); United States v. Dees, 467 F.3d 847, 852 (3d Cir.
2006); United States v. Terpening, 902 F.2d 42 (9th Cir. 1990)
("Violation of conditional release following a parole violation
is similar to violation of a pretrial conditional release: in
both instances the defendant was given his liberty on the
understanding that he act lawfully, and in both cases the
defendant violated this trust.  Such a violation is indicative of
recidivist tendencies.  Moreover, like violation of pretrial
conditional release, violation of conditional release following a
parole violation is not otherwise reflected in a defendant's
criminal history.  Thus, Terpening's violation of conditional
release . . . is an indication that his criminal history
significantly under-represents the likelihood that he will commit
further crimes . . . .").

### c.  Nature of the Instant Charges

The present charges against Depiro involve crimes of violence and evince increasing criminality.  Notably, the instant charges demonstrate Depiro's continued criminal involvement with the New Jersey waterfront and victimization of port workers. Depiro is also charged with conspiracy to make extortionate collections of credit, pursuant to which Richard Dehmer threatened violence against individuals to compel them to pay debts owed to Depiro.

Depiro is charged with conspiracy to extort money from ILA union members which, as discussed above, is a crime of violence because it involves the actual and threatened use of force, violence and fear.  Moreover, Depiro's extortion scheme was successful over an extended period of time due to the reputation of the Genovese crime family crew of which he is a member.  Indeed, as part of the investigation, the United States Attorney's Offices for the Eastern District of New York and the District of New Jersey conducted numerous interviews of ILA union members, regarding, among other topics, the Christmastime tribute payments.  Many of the witnesses stated that, based on what they heard on the docks and otherwise, they feared the consequences of refusing to make the extortionate payments at issue given the reputation of the individuals involved.

Just as significantly, the instant charges establish
that Depiro has been undeterred from continued criminal
involvement on the New Jersey waterfront.  Indeed, Depiro
previously pled guilty in 1999 to RICO charges relating to the
waterfront, for which he received a substantial term of
incarceration and supervised release.  Notwithstanding that
sentence – and while on supervised release – Depiro continued to
victimize dockworkers through crimes of violence and increasingly
sophisticated schemes to control and influence corrupt ILA union
officials.  Hence, the instant charges are even more serious when
considered in conjunction with Depiro's similar past conduct.
See, e.g., Provenzano, 605 F.2d at 89 ("Concluding that he would
continue to exercise his influence within the union corruptly and
in violation of the criminal law, the trial judge found that
Provenzano's freedom pending appeal would constitute a danger to
the community.").

Finally, Depiro and those acting on his behalf have
demonstrated a willingness to resort to threats of violence in
furtherance of their criminal enterprise.  For instance, in a
July 17, 2009 intercepted telephone call between Depiro and a
sports bettor, Depiro threatened: "Don't be fuckin' doin' that,
what you're doin'.  I'm telling you that right now.  I mean you
got something in tonight and that's not right."  In context, and
based on witness testimony, in this statement, Depiro was

36

referring to the fact that the bettor had placed additional bets despite not having paid his outstanding sports betting losses. Due to Depiro's formidable reputation and the bettor's fear of Depiro, he called Dehmer less than an hour later, stating, "I got 1300 of my own money on me, I'll just drop that off."

Similarly, Dehmer repeatedly threatened violence and harm on Depiro's behalf against individuals who failed to timely pay sports-betting losses.  For example, in intercepted telephone calls, Dehmer sent word to another bettor "that some people are really mad at him," and "somebody is furious at him."  Likewise, Dehmer told a bettor "you better be here before 2:00 because somebody is going to be fucking furious" and, when the bettor suggested that he would not be able to pay, Dehmer further stated, "this guy is going to be so fucking mad."  Finally, in another intercepted telephone call, Dehmer told an individual, "this guy is fucking mad.  You know you get paid on a certain fucking day, he wants to get paid."  In context and based on additional intercepted calls, it is apparent that Dehmer is referring to Depiro in these calls.

In sum, the current charges involve not only crimes of violence, but also actual threats of force, violence and fear directed at numerous, identified victims.  Furthermore, the charges are indicative of Depiro's long-term victimization of New Jersey port workers, undaunted by a prior period of

incarceration, and represent a heightened degree of danger and sophistication in comparison to his prior crimes. Finally, the instant charges illustrate Depiro's far-ranging control and influence over criminal associates, from corrupt ILA union officials to bookmakers. Consequently, the nature of the charges at issue here weighs heavily in favor of Depiro's detention.

### d. Weight of the Evidence

The weight of the evidence against Depiro is overwhelming, and includes countless recordings, cooperating witnesses, physical surveillance and Depiro's own admissions. A partial summary of the evidence against Depiro follows.

Government witnesses, themselves members and associates of the Genovese crime family and other crime families, are expected to testify that Depiro is a "made" member of the Genovese crime family who controls the crime family's port-related rackets, a capacity in which he supervises and exercises influence over others, including corrupt ILA union officials.

Additionally, wiretap intercepts further evidence Depiro's role in the Genovese crime family's rackets on the New Jersey piers. For example, Depiro was captured, pursuant to court-authorized wiretapping, in a telephone call on September 14, 1998 speaking to Fiumara regarding the ILA extortion scheme. The recorded call was described as follows in Depiro's October

2003 Pre-Sentence Report, Paragraph 21(e), to which he and his counsel raised no objection:

> DePiro told Fiumara that at Christmas time he is going to demand double the amount of money from people. Fiumara responded: "Yeah. Definitely." DePiro told Fiumara about someone at the Port who he tried to collect from last Christmas who claimed "you took all my money" and that he was broke. DePiro explained to Fiumara that this person made $220,000 - $250,000 a year. DePiro told Fiumara that he does not want "Brief [Lawrence Ricci] to say he wants two percent" and Fiumara said that Brief [Ricci] should "mind his own business." DePiro told Fiumara that Brief [Ricci] has "all the guys that he works there, bring us double and that's that and we'll go from there." Fiumara responded: "Without a doubt."

Cooperating witness testimony and wiretap intercepts regarding the waterfront extortion conspiracy are corroborated by observations made by law enforcement agents during the course of this investigation. From approximately September 2009 to January 2010, Depiro was observed meeting with Fiumara on multiple occasions in Manhattan and on Long Island (where Fiumara resided before his death in September 2010).

For example, on January 11, 2010, law enforcement agents conducted surveillance of Depiro and Fiumara at Bryant & Cooper steakhouse, located at 2 Middleneck Road, Roslyn, New York. Inside the restaurant, law enforcement agents observed Fiumara, Depiro and an attorney meeting at a small tabletop in the bar area. Law enforcement agents overheard portions of the attorney, Depiro and Fiumara's conversation, including, among other things, the following statement: "Christmas is long gone."

In context, this overheard comment evidences Depiro's and Fiumara's concerns about the future of the extortion scheme discussed above, by which members of the ILA are required to provide tribute payments to ILA union officials around Christmas, which payments are in turn transmitted to the Genovese crime family.

With respect to Depiro's involvement in illegal gambling, in addition to the intercepted telephone calls described above, law enforcement has captured additional conversations that evidence Depiro's control over and management of an illegal gambling operation.  Those recorded conversations are also corroborated by documentary evidence recovered upon the execution of a search warrant at Dehmer's illegal gambling club in Kenilworth, New Jersey, on or about January 20, 2010. Finally, Depiro's own admissions establish his guilt. Specifically, in December 2006, Depiro was interviewed by law enforcement agents.  During the interview, Depiro admitted that he was a gambler and a bookmaker and was arrested in the mid-1990s in an illegal gambling ring.  In addition, Depiro acknowledged that he was arrested in the late 1990s along with Tino Fiumara.

In short, the evidence in this case establishes that Depiro committed the crimes at issue, and that he did so by virtue of his membership in the Genovese crime family.  As set

forth above, courts routinely consider the heightened danger
posed by a defendant's membership in an organized, criminal
enterprise when evaluating whether pretrial release is
appropriate.  Here, no condition of release could ensure that
Depiro would renounce his status in the Genovese crime family,
control over and involvement in the crime family's port-related
rackets, which have thrived for decades.  Depiro's leadership
position within the Genovese crime family and the likelihood that
he will continue to direct the activities of criminal associates
is, therefore, a danger to the community that cannot be mitigated
barring Depiro's detention.  See, e.g., Salerno, 631 F. Supp. at
1375.

### e.  Severity of Penalties Faced

Depiro, age 55, faces severe penalties, including a
maximum prison sentence of 90 years, if convicted of the instant
charges.  Thus, there is a possibility that Depiro will spend the
remainder of his days incarcerated.  Accordingly, despite his
ties to New Jersey and the apparent willingness of others to post
property on his behalf, Depiro poses a serious risk of flight.
See, e.g., Bergrin, 2009 WL 1560039, at *8 (balancing defendant's
"significant and long-standing ties to the community" against
defendant's criminal history and ordering detention); United
States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990)
("Consideration of the nature of the offenses charged involves

41

consideration of the penalties.  The defendants are charged with
multiple counts, and it is reasonable, from their perspective, to
look at the potential maximum sentences they face if they were
found guilty on each count and sentenced consecutively on each
count.  Whyte faces a potential sentence of 35 years, Mohan and
Townsend a potential sentence of 70 years.  . . .  Facing the
much graver penalties possible under the present indictment, the
defendants have an even greater incentive to consider flight.").

                              *   *   *

          For all of the foregoing reasons, the Government
respectfully submits that the Court should enter a permanent
order of detention as to RICO Defendant Stephen Depiro based on
danger to the community and risk of flight.

          **2.   Genovese Crime Family Associate Nunzio LaGrasso**

          As alleged in the Superseding Indictment, RICO
Defendant Nunzio LaGrasso, like Cernadas, utilized his high-
ranking and influential union position to force dockworkers to
make tribute payments of money at Christmastime for more than 20
years.  Although he served as the Vice-President of ILA Local
1478, LaGrasso exercised such influence and control over the New
Jersey waterfront that he was able to compel dockworkers from
other ILA Locals to relinquish money to the mob.  As a Genovese
crime family associate, LaGrasso acted on behalf of the crime
family and, more specifically, his cousin, Stephen Depiro, to

                                42

commit the foregoing crimes of violence and victimize those ILA members whose interests he was supposed to serve. Thus, given the nature of the crimes at issue and his criminal associations, LaGrasso poses a danger to the community.

In addition, LaGrasso, age 60, faces a substantial prison sentence. Furthermore, following his arrest on New Jersey state charges in April 2010, LaGrasso was suspended from employment on the New Jersey waterfront and stands to lose his position permanently. Hence, LaGrasso constitutes a flight risk because he is facing a severe jail term and the loss of long-term, meaningful employment.

For these reasons, LaGrasso is similarly situated to fellow RICO Defendant and former ILA union official Albert Cernadas, for whom bail was set on December 13, 2010, by Magistrate Judge Salas. Indeed, given the nature of the charges and potential flight risk, Magistrate Judge Salas determined that a significant bail package was appropriate and, among other conditions, required that Cernadas post a $1,000,000 bond secured by multiple properties with equity of approximately $700,000, i.e., at least 70% secured. Since LaGrasso and Cernadas face similar penalties and share similar levels of culpability in the RICO extortion scheme, their bail packages should be substantially similar.

43

### 3.   Genovese Crime Family Associate Richard Dehmer

RICO Defendant Dehmer, as a Genovese crime family associate, operated and managed with Depiro and others an illegal gambling operation involving bookmaking, and managed an illegal poker club.  In this regard, Dehmer exercised direction and oversight over numerous other individuals associated with the sports betting and gambling club operations, including but not limited to the Gambling Defendants charged in the Superseding Indictment.  For example, Dehmer conducted regular poker tournaments at the gambling club in Kenilworth, New Jersey, which required him to arrange card dealers, such as Anthony Alfano and Giuseppe Pugliese, another Genovese crime family associate, and to organize players.

Another of Dehmer's responsibilities was to ensure that bettors timely paid gambling losses.  In so doing, Dehmer resorted to threats of violence against others.  For examale, pursuant to court-authorized wiretapping, Dehmer was captured in a recorded telephone call discussing a bettor's outstanding debt with defendant Giuseppe Pugliese, stating that, "I am going over there tonight.  I am going over there with a fucking bat, I really am."  Referencing the same bettor in a subsequent telephone call, Dehmer said, "It is costing me money.  I got to borrow money to pay but I guarantee you, I guarantee you, he needs his hands to work.  He ain't working no more for a while."

44

Finally, referencing the same bettor, Dehmer said that he had told another individual to "tell him [the bettor] that I am coming over there, and I will break every bone in his fucking hands so he can't work."

Given the nature of the charges, Dehmer's demonstrated willingness to use violence to further his and Depiro's interests, and Dehmer's criminal association with the Genovese crime family, Dehmer should not be released in the absence of a secured bond with a condition of house arrest, enforced by electronic monitoring.  In addition, house arrest is appropriate to mitigate the risk of flight that exists given that Dehmer, age 75, faces a maximum penalty of 20 years' incarceration on certain charges.

**B.**          **EXTORTION DEFENDANTS**

Defendants Edward Aulisi, Vincent Aulisi, Thomas Leonardis, Robert Ruiz, Michael Trueba, Ramiro Quintans, and Salvatore LaGrasso are ILA union members who – not unlike the foregoing Genovese crime family members and associates – extorted ILA dockworkers at Christmastime.  These defendants, most of whom were entrusted to act in the interests of those they supervised or represented, utilized their positions to victimize those in their ward.  It cannot be gainsaid that, if these defendants were so brazen as to perpetrate crimes of violence against individuals in their very workplace, there can be no assurance that they

45

would act lawfully were they to be released into the community without substantial bail conditions.

In this regard, given the nature of the charges and the need to protect witnesses, both with respect to those who have already come forward and are identified in the Superseding Indictment as well as prospective victims in the scheme, it is necessary to bar the Extortion Defendants (and RICO Defendants Stephen Depiro, Albert Cernadas, Nunzio LaGrasso) from further association in any manner, means or capacity, with the ILA and/or New Jersey waterfront.[8] See, e.g., United States v. Traitz, 807 F.2d 322, 325-26 (3d Cir. 1986) (affirming district court's pretrial release order based on house arrest and "removal of the defendants from union activities," because "the district court did not err in determining that house arrest combined with the other conditions of release, including in particular the requirement that defendants cease all connection with the Roofer's Union through which and on whose behalf many of the crimes of violence were allegedly committed, would provide the reasonable assurance required by the statute of the safety of the community").

---

[8]    It is the government's understanding that, based on the defendants' indictment, their passes to enter the New Jersey and New York waterfront will be suspended, effective immediately, by the Waterfront Commission of New York Harbor. The defendants, however, apparently will retain their ILA memberships pending further review.

46

Furthermore, each Extortion Defendant faces severe maximum penalties upon conviction: (1) Edward Aulisi, age 51, 20 years' incarceration; (2) Vincent Aulisi, age 78, 100 years' incarceration; (3) Thomas Leonardis, age 53, 60 years' incarceration; (4) Robert Ruiz, age 52, 100 years' incarceration; (5) Michael Trueba, age 75, 160 years' incarceration; (6) Ramiro Quintans, age 52, 140 years' incarceration; and (7) Salvatore LaGrasso, age 54, 40 years' incarceration.  In addition, upon arrest, each defendant likely will be suspended from further employment on the New Jersey waterfront, further severing their ties to this District.  Accordingly, each of the Extortion Defendants poses a risk of flight.

Thus, bail packages consisting of significant secured bonds are appropriate.  For years, these defendants held lucrative positions with the ILA and received substantial remuneration, some for decades.  Given the defendants' means, there will little deterrent to flight absent bail conditions comprising large secured bonds.  For example, a criminal complaint against Robert Ruiz charging him with conspiring to commit Hobbs Act extortions in 2008 and 2009 was filed in the Eastern District of New York on December 6, 2010.  The Ruiz complaint, which was dismissed on January 6, 2011 in anticipation of the instant prosecution, alleged, among other things, that the government had recovered $51,900 in cash buried in a

47

longshoreman's backyard, and that the longshoreman, who was himself a victim of the extortion scheme, had been asked by Ruiz to hold the money.  There, Magistrate Judge Joan M. Azrack released Ruiz on a $500,000 bond secured by property with equity of approximately $350,000, i.e., at least 70% fully secured. That charge has now been converted from a complaint in the Eastern District of New York to an indictment based on a probable cause finding by a grand jury sitting in Newark, New Jersey, that Ruiz committed the offenses in question, including additional extortions, pursuant to which he now faces a 100-year sentence.

        In other words, the full nature and scope of the extensive criminal conspiracy involving numerous other ILA members indicted here was not before Magistrate Judge Azrack at the time of her decision.  Moreover, this case involves New Jersey victims and a need to protect the New Jersey community from further crimes of these defendants, all of whom are New Jersey residents.  Accordingly, while Magistrate Judge Azrack's decision regarding Ruiz's pretrial release establishes a "floor" pursuant to which this Court should evaluate bail, it fails to redress adequately the serious danger to the community and flight risk posed by each of the Extortion Defendants, a number of whom

48

have heightened relative levels of culpability and criminal

responsibility in the scheme.[9]

_____

[9]     For many of these same reasons, Depiro's current
conditions of pretrial release are insufficient.  On March 30,
2010, Depiro was charged via criminal complaint in the Eastern
District of New York with racketeering and racketeering
conspiracy, including predicate acts involving conspiring to
extort ILA members and officials, conspiring to use extortionate
means to collect extensions of credit and illegal gambling.
Depiro also was charged with conspiring to harbor fugitive
Michael Coppola.  There, Magistrate Judge Robert M. Levy released
Depiro conditioned on a significant, secured bond and home
detention, with exceptions for daily religious services and as
approved by Pretrial Services.  On or about April 28, 2010,
Depiro was indicted by a grand jury sitting in the Eastern
District of New York for various offenses relating to his
harboring of Coppola, which charges are currently pending, and
the foregoing complaint was dismissed.

        In contrast to the prior complaint, Depiro has now been
indicted by a federal grand jury sitting in Newark, New Jersey.
Significantly, the Superseding Indictment represents a finding by
the grand jury, based on the evidence presented, that probable
cause exists that Depiro committed the crimes in question.  The
instant prosecution, moreover, is based on a far more extensive
and wide-ranging conspiracy, involving many more victims and
participants, than that alleged in the prior complaint.  Indeed,
there are 15 defendants named in the Superseding Indictment, and
many victims of Depiro's crimes are specifically identified.  In
comparison, in the complaint, Depiro was the sole defendant and
no victims were identified.  Thus, there are additional,
unaddressed concerns here relating to potential obstruction of
justice, which Depiro has committed previously, and
witness/victim interference.  Finally, given the status of the
ongoing investigation, the evidence presented to Magistrate Judge
Levy was far more limited than that documented herein; the
evidence now before the Court paints a compelling portrait of an
individual who has continued to commit crimes on behalf of the
Genovese crime family against New Jersey victims despite a
substantial period of incarceration and repeated violations of
release conditions, none of which has deterred Depiro from the
commission of further crimes endangering this community.
Depiro's danger to the community and risk of flight, therefore,
can only be adequately and appropriately addressed through
detention.

## CONCLUSION

For each of the foregoing reasons, the government respectfully submits that the Court should enter an order detaining lead defendant Stephen Depiro pretrial and releasing the remaining defendants on the above-described conditions.  The government reserves its right to supplement its position with respect to each defendant.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

By: _____
Anthony J. Mahajan
Jacquelyn M. Rasulo
Taryn A. Merkl
Assistant U.S. Attorneys

50

## APPENDIX A

A.   **RICO DEFENDANTS**

1.   **RICO Charges (Counts 1 and 2)**

| COUNT/RA | Defendant | Offense/Statute | Date |
|---|---|---|---|
| Count 1 | DEPIRO CERNADAS N. LAGRASSO DEHMER | RICO Conspiracy, 18 U.S.C. § 1962(d) | December 1982 - January 2011 |
| RA1 | DEPIRO CERNADAS N. LAGRASSO | Hobbs Act Extortion Conspiracy, 18 U.S.C. § 1951(a) | December 1982 - January 2011 |
| RA2 - RA33 | CERNADAS | Hobbs Act Extortion, 18 U.S.C. § 1951(a); N.J. Statute 2C:20-5(g) | December 1982 - January 2006 |
| RA34 - RA70 | N. LAGRASSO | Hobbs Act Extortion, 18 U.S.C. § 1951(a); N.J. Statute 2C:20-5(g) | December 1989 - January 2010 |
| RA71 | DEPIRO DEHMER | Illegal Gambling - Sports Betting, 18 U.S.C. § 1955 /N.J. Statute 2C:37-2; Use of Interstate Facility to Transmit Wagering Information, 18 U.S.C. § 1084 | July 2009 - January 2010 |
| RA72 | DEPIRO DEHMER | Conspiracy to Use Extortionate Means to Collect Extensions of Credit/Use of Extortionate Means to Collect Extensions of Credit, 18 U.S.C. § 894(a) | July 2009 - January 2010 |
| RA73 | DEHMER | Illegal Gambling - Poker, 18 U.S.C. § 1955 | July 2009 - January 2010 |

51

| COUNT/RA | Defendant | Offense/Statute | Date |
|---|---|---|---|
| Count 2 | DEPIRO DEHMER | CUD RICO Conspiracy, 18 U.S.C. § 1962(d) | July 2009 - January 2010 |

2.   **Substantive Extortion Charges (Counts 3-4; 9; 14-25; 43-44)**

| Count | Defendant | Offense/Statute | Date |
|---|---|---|---|
| Count 3 | DEPIRO CERNADAS N. LAGRASSO | Hobbs Act Extortion Conspiracy, 18 U.S.C. § 1951(a) | December 1982 - January 2011 |
| Counts 4 & 9 | CERNADAS | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2005 - January 2006 |
| Counts 14 - 25 | N. LAGRASSO | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2006 - January 2010 |
| Count 43 | DEPIRO DEHMER | Extortionate Collection of Credit Conspiracy, 18 U.S.C. § 894(a)(1) | January 2009 - January 2010 |
| Count 44 | DEHMER | Extortionate Collection of Credit, 18 U.S.C. § 894(a)(1) | October 2009 - January 2010 |

3.   **Substantive Illegal Gambling Charges (Counts 41-42; 45-53)**

| Count | Defendant | Offense/Statute | Date |
|---|---|---|---|
| Count 41 | DEPIRO DEHMER | Illegal Gambling Conspiracy - Bookmaking, 18 U.S.C. § 371 | July 2009 - January 2010 |
| Count 42 | DEPIRO DEHMER | Illegal Gambling - Bookmaking, 18 U.S.C. § 1955(a) | July 2009 - January 2010 |

52

| Count | Defendant | Offense/Statute | Date |
|-------|-----------|-----------------|------|
| Counts 45 - 51 | DEHMER | Transmission of Wagering Information, 18 U.S.C. § 1084 | Various dates in 2009 & 2010 |
| Count 52 | DEHMER | Illegal Gambling Conspiracy - Poker, 18 U.S.C. § 371 | July 2009 - January 2010 |
| Count 53 | DEHMER | Illegal Gambling - Poker, 18 U.S.C. § 1955(a) | July 2009 - January 2010 |

B.        EXTORTION DEFENDANTS

| Count | Defendant | Offense/Statute | Date |
|-------|-----------|-----------------|------|
| Count 3 | S. DEPIRO<br>A. CERNADAS<br>N. LAGRASSO<br>E. AULISI<br>V. AULISI<br>S. LAGRASSO<br>LEONARDIS<br>QUINTANS<br>RUIZ<br>TRUEBA | Hobbs Act Extortion Conspiracy, 18 U.S.C. § 1951(a) | December 1982 - January 2011 |
| Counts 5-6 | V. AULISI | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2006 - January 2008 |
| Counts 7-8 | RUIZ | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2008 - January 2010 |
| Counts 10-11 | V. AULISI | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2006 - January 2008 |
| Counts 12-13 | RUIZ | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2008 - January 2010 |
| Count 26 | QUINTANS | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2008 - January 2009 |

53

| Count | Defendant | Offense/Statute | Date |
|---|---|---|---|
| Count 27 | S. LAGRASSO | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2009 - January 2010 |
| Counts 28-29 | QUINTANS | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2008 - January 2010 |
| Count 30 | TRUEBA | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2007 - January 2008 |
| Count 31 | LEONARDIS TRUEBA | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2008 - January 2009 |
| Count 32 | LEONARDIS | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2009 - March 2010 |
| Counts 33-36 | TRUEBA | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2006 - January 2010 |
| Count 37 | TRUEBA | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2007 - January 2008 |
| Counts 38-40 | QUINTANS | Hobbs Act Extortion, 18 U.S.C. § 1951(a) | December 2007 - January 2010 |